**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
30 East 39th Street, Second Floor
New York, NY 10016
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiffs and the Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

FREDERICK TRONCOSO and JOHN DOES 1-100,
*on behalf of themselves and others similarly situated*,

        Plaintiffs,

    v.

KISS MY FACE, LLC,

        Defendant.

---

Case No.:

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

Plaintiffs FREDERICK TRONCOSO and JOHN DOES 1-100 (together, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, as and for their Complaint against the Defendant, KISS MY FACE, LLC (hereinafter, "KISS MY FACE" or "Defendant"), alleges the following based upon personal knowledge as to themselves and their own action, and, as to all other matters, respectfully alleges, upon information and belief, as follows (Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery):

## <u>NATURE OF THE ACTION</u>

1.    This action seeks redress for a deceptive and otherwise improper business practice that Defendant, KISS MY FACE, LLC, engages in with respect to the packaging of its

Obsessively Natural Children's 100% Natural Toothpaste product (hereinafter, the "Product") as "100% Natural" when it is formulated with the non-natural, highly chemically and industrially processed ingredient Glycerin.

2.     The term "natural" only applies to those products that contain no unnatural or synthetic ingredients and consist entirely of ingredients that are only minimally processed.  The Defendant, however, deceptively used the term "natural" to describe products containing ingredients that have been either extensively chemically processed or fundamentally altered from their natural state and thus cannot be considered "minimally processed." The use of the term "natural" to describe such products created consumer confusion and was misleading. Plaintiffs allege that the Defendant dishonestly described their Product as being "100% Natural" when, in fact, it is not.

3.     The term "100% Natural" was clear and prominent on the packaging and advertising of Product, including multiple sides of the thin cardboard box the toothpaste tube is packaged in, as shown below:





4.     By marketing the Product as "100% Natural," Defendant took wrongful advantage of consumers' strong preference for oral and personal care products made entirely of natural ingredients.  In a survey conducted by the Shelton Group in 2009, 55%, i.e. more  than half, of the 1,006 consumers surveyed actively looked for greener products in the "personal care products (shampoo, lotion, etc.)"[1].

5.      Defendant profited in this lucrative market for natural products by misleadingly labeling the Product as "100% Natural" and selling them to consumers who sought to purchase products made from ingredients that are found in nature and who were willing to pay more for such products.

---

[1] *See, e.g.,* Consumers Prefer '100% Natural' Label Over 'Organic', Environmental Leader (Jul. 3, 2009), http://environmentalleader.com/2009/07/03/consumers-prefer-100-natural-label-over-organic (describing EcoPulse market report by Shelton Group) (last visited March 10, 2014).

6.     Defendant's Product, however, contain substantial quantities of Glycerin, an ingredient that is non-natural and highly processed.

7.     Glycerin is a synthetic, factory-produced texturizer that is created by complex processing and does not occur in nature. It is commonly used in processed foods as a sugar substitute, humectant, filler and thickening agent.

8.     Plaintiffs bring this proposed consumer class action on behalf of themselves and all other persons nationwide, who, from the applicable limitations period up to and including the present ("Class Period"), purchased for consumption and not resale any of Defendant's Product.

9.     Defendant violated statutes enacted in each of the fifty states and the District of Columbia that are designed to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising. These statutes are:

1) Alabama Deceptive Trade Practices Act, Ala. Statues Ann. §§ 8-19-1, *et seq.;*
2) Alaska Unfair Trade Practices and Consumer Protection Act, Ak. Code § 45.50.471, *et seq.;*
3) Arizona Consumer Fraud Act, Arizona Revised Statutes, §§ 44-1521, *et seq.;*
4) Arkansas Deceptive Trade Practices Act, Ark. Code § 4-88-101, *et seq.;*
5) California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.,* and California's Unfair Competition Law, Cal. Bus. & Prof Code § 17200, *et seq.;*
6) Colorado Consumer Protection Act, Colo. Rev. Stat. § 6 - 1-101, *et seq.;*
7) Connecticut Unfair Trade Practices Act, Conn. Gen. Stat § 42-110a, *et seq.;*
8) Delaware Deceptive Trade Practices Act, 6 Del. Code § 2511, *et seq.;*
9) District of Columbia Consumer Protection Procedures Act, D.C. Code § 28 3901, *et seq.;*
10) Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201, *et seq.;*
11) Georgia Fair Business Practices Act, § 10-1-390 *et seq.;*
12) Hawaii Unfair and Deceptive Practices Act, Hawaii Revised Statues § 480 1, *et seq.,* and Hawaii Uniform Deceptive Trade Practices Act, Hawaii Revised Statutes § 481A-1, *et seq.;*
13) Idaho Consumer Protection Act, Idaho Code § 48-601, *et seq.;*
14) Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et seq.;*
15) Indiana Deceptive Consumer Sales Act, Indiana Code Ann. §§ 24-5-0.5-0.1, *et seq.;*
16) Iowa Consumer Fraud Act, Iowa Code §§ 714.16, *et seq.;*
17) Kansas Consumer Protection Act, Kan. Stat. Ann §§ 50 626, *et seq.;*
18) Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann §§ 367.110, *et seq.,* and the Kentucky Unfair Trade Practices Act, Ky. Rev. Stat. Ann §§ 365.020, *et seq.;*
19) Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. § § 51:1401, *et seq.;*

*20)* Maine Unfair Trade Practices Act, 5 Me. Rev. Stat. § 205A, *et seq.,* and Maine Uniform Deceptive Trade Practices Act, Me. Rev. Stat. Ann. 10, § 1211, *et seq.,*
*21)* Maryland Consumer Protection Act, Md. Com. Law Code § 13-101, *et seq.;*
*22)* Massachusetts Unfair and Deceptive Practices Act, Mass. Gen. Laws ch. 93A;
*23)* Michigan Consumer Protection Act, § § 445.901, *et seq.;*
*24)* Minnesota Prevention of Consumer Fraud Act, Minn. Stat §§ 325F.68, *et seq.;* and Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.;*
*25)* Mississippi Consumer Protection Act, Miss. Code Ann. §§ 75-24-1, *et seq.;*
*26)* Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.;*
*27)* Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code §30-14-101, *et seq.;*
*28)* Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59 1601, *et seq.,* and the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-301, *et seq.;*
*29)* Nevada Trade Regulation and Practices Act, Nev. Rev. Stat. §§ 598.0903, *et seq.;*
*30)* New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq. ;*
*31)* New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8 *1, et seq.;*
*32)* New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57 12 *1, et seq.;*
*33)* New York Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law §§ 349, *et seq.;*
*34)* North Dakota Consumer Fraud Act, N.D. Cent. Code §§ 51 15 01, *et seq.;*
*35)* North Carolina Unfair and Deceptive Trade Practices Act, North Carolina General Statutes §§ 75-1, *et seq.;*
*36)* Ohio Deceptive Trade Practices Act, Ohio Rev. Code. Ann. §§ 4165.01. *et seq.;*
*37)* Oklahoma Consumer Protection Act, Okla. Stat. 15 § 751, *et seq.;*
*38)* Oregon Unfair Trade Practices Act, Rev. Stat § 646.605, *et seq.;*
*39)* Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Penn. Stat. Ann. § § 201-1, *et seq.;*
*40)* Rhode Island Unfair Trade Practices And Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq.;*
*41)* South Carolina Unfair Trade Practices Act, S.C. Code Laws § 39-5-10, *et seq.;*
*42)* South Dakota's Deceptive Trade Practices and Consumer Protection Law, S.D. Codified Laws §§ 37 24 *1, et seq.;*
*43)* Tennessee Trade Practices Act, Tennessee Code Annotated §§ 47-25-101, *et seq.;*
*44)* Texas Stat. Ann. §§ 17.41, *et seq.,* Texas Deceptive Trade Practices Act, *et seq.;*
*45)* Utah Unfair Practices Act, Utah Code Ann. §§ 13-5-1, *et seq.;*
*46)* Vermont Consumer Fraud Act, Vt. Stat. Ann. tit.9, § 2451, *et seq.;*
*47)* Virginia Consumer Protection Act, Virginia Code Ann. §§59.1-196, *et seq.;*
*48)* Washington Consumer Fraud Act, Wash. Rev, Code § 19.86.010, *et seq.;*
*49)* West Virginia Consumer Credit and Protection Act, West Virginia Code § 46A-6-101, *et seq.;*
*50)* Wisconsin Deceptive Trade Practices Act, Wis. Stat. §§ 100. 18, *et seq.;*
*51)* Wyoming Consumer Protection Act, Wyoming Stat. Ann. §§40-12-101, *et seq.*

10.     Defendant marketed their Kiss My Face toothpaste Product in a way that is deceptive to consumers under consumer protection laws of all fifty states and the District of Columbia. Defendant has been unjustly enriched as a result of their conduct. For these reasons, Plaintiffs seek the relief set forth herein.

## JURISDICTION AND VENUE

11.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because this is a class action, as defined by 28 U.S.C § 1332(d)(1)(B), in which a member of the putative class is a citizen of a different state than Defendant, and the amount in controversy exceeds the sum or value of $5,000,000, excluding interest and costs. *See* 28 U.S.C. § 1332(d)(2).

12.     The Court has jurisdiction over the federal claims alleged herein pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States.

13.     The Court has jurisdiction over the state law claims because they form part of the same case or controversy under Article III of the United States Constitution.

14.     Alternatively, the Court has jurisdiction over all claims alleged herein pursuant to 28 U.S.C § 1332 because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

15.     The Court has personal jurisdiction over Defendant because their Product is advertised, marketed, distributed, and sold throughout New York State; Defendant engaged in the wrongdoing alleged in this Complaint throughout the United States; including in New York State; Defendant is authorized to do business in New York State; and Defendant has sufficient minimum contacts with New York and/or otherwise have intentionally availed themselves of the markets in New York State, rendering the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. Moreover, Defendant is engaged in substantial and not isolated activity within New York State.

16.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District. Plaintiff FREDERICK TRONCOSO is a citizen of New York and have

purchased the Product from Defendant in this District. Moreover, Defendant distributed, advertised, and sold the Product, which is the subject of the present Complaint, in this District.

## PARTIES

*Plaintiffs*

17.    Plaintiff FREDERICK TRONCOSO is, and at all times relevant hereto has been, a citizen of the State of New York and resides in Bronx County. During the Class Period, Plaintiff TRONCOSO purchased the Product for personal consumption within the State of New York. Specifically, Plaintiff TRONCOSO purchased the Product from the Walgreens.com website. The purchase price was $5.95 (or more) for an individual adult toothpaste Product. Both Plaintiff TRONCOSO and his child used the Product. Plaintiff TRONCOSO purchased the Product at a premium price and was financially injured as a result of Defendant's deceptive conduct as alleged herein. Further, should Plaintiff TRONCOSO encounter the Product in the future, he could not rely on the truthfulness of the packaging, absent corrective changes to the packaging. However, Plaintiff TRONCOSO would still be willing to purchase the current formulation of the Product, absent the price premium, so long as Defendants engage in corrective advertising.

18.    Plaintiffs JOHN DOES 1-100 are, and at all times relevant hereto has been, citizens of the any of the fifty states and the District of Columbia. During the Class Period, Plaintiffs JOHN DOES 1-100 purchased the Product for personal consumption or household use within the United States. Plaintiffs purchased the Product at a premium price and were financially injured as a result of Defendant's deceptive conduct as alleged herein.

*Defendant*

19.     Defendant KISS MY FACE, LLC. is a Delaware corporation, with a mailing address at  P.O. Box 224, 144 Main St., Gardiner, NY 12525 and an address for service of process located at the Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801.

20.     Defendant develops, markets and sells personal care and hygiene products throughout the United States under the popular brand name "Kiss My Face".  The advertising for the Product, relied upon by Plaintiffs, was prepared and/or approved by Defendant and their agents, and was disseminated by Defendant and their agents through advertising containing the misrepresentations alleged herein. The advertising for the Product was designed to encourage consumers to purchase the Product and reasonably misled the reasonable consumer, i.e. Plaintiffs and the Class, into purchasing the Product. Defendant owns, manufactures and distributes the Product, and created and/or authorized the unlawful, fraudulent, unfair, misleading and/or deceptive labeling and advertising for the Product.

## FACTUAL ALLEGATIONS

21.     Defendant manufactures, markets, advertises and sells personal care and hygiene products in the United States and throughout the world.

22.     Defendant markets numerous products under their "Kiss My Face" brand such as the Product purchased by Plaintiffs. The Product is available at many higher-end supermarket chains and grocery stores and other retail outlets throughout the United States, including but not limited to Whole Foods.

23.     The Kiss My Face website displays the entirety of its oral care Product lines with brief product descriptions on each product page. The liberal use of the word "Natural" in

statements and product descriptions associated with the individual Product further fortified the idea that the Product is natural or, at the very least, minimally processed. The Product is listed under "Natural Oral Care", as shown below:



24.     By representing that Product was "Natural," Defendant sought to capitalize on consumers' preference for natural products and the association between such products and a wholesome way of life. Consumers are willing to pay more for natural products because of this association as well as the perceived higher quality, health and safety benefits and low impact on the environment associated with products labeled as "Natural."

25.     Although Defendant represented the Product as "Natural," they are not natural because they contain the highly processed ingredient Glycerin.

26.     As a result of Defendant's deception, consumers – including Plaintiffs and members of the proposed Class – have purchased a Product that claims to be natural. Moreover,

Plaintiffs and Class members have paid a premium for the Product over other toothpaste products sold on the market. A sample of other toothpaste products are provided below:

**Children's toothpaste**

| BRAND | QUANTITY | PRICE | SELLER |
|---|---|---|---|
| Crest Kids Hello Kitty Toothpaste, Bubble Gum | 4.2oz | $1.99 | Drugstore.com |
| Crest Pro-Health Stages Anticavity Toothpaste for Kids, Minnie Berry | 4.2oz | $2.99 | Drugstore.com |
| **Kiss My Face 100% Natural Children's Toothpaste, Berry Smart** | 4oz | $5.95 | Kissmyface.com |

**Definition of Natural**

27. The FDA did not intend to and has repeatedly declined to establish a final rule with regard to a definition of the term "natural" in the context of food labeling. As such, Plaintiffs' state consumer protection law claims are not preempted by federal regulations. See *Jones v. ConAgra Foods, Inc.*, 2012 WL 6569393, *6 (N.D. Cal. Dec. 17, 2012). Additionally, the primary jurisdiction doctrine does not apply "because the FDA has repeatedly declined to adopt formal rule-making that would define the word 'natural.'" *Id.* at p. 8.

28. The "FDA has not developed a definition for use of the term natural or its derivatives," but it has loosely defined the term "natural" as a product that "does not contain added color, artificial flavors, or synthetic substances." According to federal regulations, an ingredient is synthetic if it is:

> [a] substance that is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plant, animal, or mineral sources, except that such term shall not apply to substances created by naturally occurring biological processes.7 C.F.R. §205.2.

29. Although there is not an exacting definition of "natural" in reference to food, cosmetic or oral care ingredients, there is no reasonable definition of "natural" that includes

ingredients that, even if sourced from "nature," are subjected to extensive transformative chemical processing before their inclusion in a product.  For example, the National Advertising Division of the Better Business Bureau ("NAD") has found that a "natural" ingredient does not include one that, while "literally sourced in nature (as is every chemical substance), . . . is, nevertheless subjected to extensive processing before metamorphosing into the" ingredient that is included in the final product.

**Artificial Creation of Unnatural Ingredients**

30. Glycerin requires multiple processing steps in an industrial environment to be transformed from animal and vegetable oils, thus it cannot be described as "natural." A technical evaluation report compiled by the USDA AMS Agricultural Analytics Division for the USDA National Organic Program explains that Glycerin is "produced by a hydrolysis of fats and oils" and is listed in the USDA Organic Program's National List as a "synthetic nonagricultural (nonorganic) substance." The same report lists several methods of producing Glycerin, each which involve numerous steps that include a combination of high temperatures and pressure and purification to get an end product:

| Table 2 Processes for producing glycerin by hydrolysis of fats and oils | |
|---|---|
| Lemmens Fryer's Process | Oil or fat is subjected in an autoclave to the conjoint action of heat and pressure (about 100 PSI) in the presence of an emulsifying and accelerating agent, e.g. zinc oxide or hydroxide (sodium hydroxide can be substituted) for about eight hours. The strong solution of glycerin formed is withdrawn and replaced by a quantity of hot, clean and preferably distilled water equal to about one third to one fourth of the weight of the original charge of oil or fat and treatment continued for an additional four hours. The dilute glycerin obtained from the latter part of the process is drawn off and used for the initial treatment of the further charge of oil or fat. |
| Budde and Robertson's Process | The oils or fats are heated and mechanically agitated with water and sulphuric acid gas, under pressure in a closed vessel or autoclave. The advantage claimed for the process are that the contents of the vessel are free from foreign matter introduced by reagents and need no purification; that the liberated glycerin is in the form of a pure and concentrated solution; that no permanent emulsion is formed and that the fatty acids are not discolored. |
| Ittner's Process | Coconut oil is kept in an autoclave in the presence of water at 70 atmospheres pressure and 225-245ºC temperature and split into fatty acids and glycerin, both being soluble under these conditions in water. The glycerin solution separates in the bottom of the autoclave. The aqueous solution contains at the end of the splitting process more than 30 percent glycerin. |
| Continuous High Pressure Hydrolysis | In this process a constant flow of fat is maintained flowing upward through an autoclave column tower against a downward counter-flow of water at a pressure of 600 PSI maintained at temperature of 480-495ºF. Under these conditions, the fat is almost completely miscible in water and the hydrolysis take place in a very short time. The liberated fatty acids, washed free of glycerin by the downward percolating water, leave the top of the column and pass through a flash tank while the liberated glycerin dissolves in the downward flow of water and is discharged from the bottom of the tower into the sweet-water storage tank. |

31.     The Product is labeled "Natural" yet contain the non-natural and extensively processed ingredient Glycerin.

32.     The "Natural" claims appears multiple times on the label of the Product as shown above in Paragraph 3.

33.     Within twelve months of the filing of this Complaint, Plaintiffs purchased the Product for personal use. Plaintiffs were attracted to the Product because they prefer to use natural products for health and environmental reasons. Plaintiffs believe that all natural products contain only ingredients that occur in nature or are minimally processed and that they would not

include Glycerin amongst such ingredients. As a result, the Product with its deceptive "Natural" claims on the Product packaging had no value to Plaintiffs. Defendant marketed the Product as "Natural" to induce consumers to purchase the Product.

**The Federal Food, Drug, and Cosmetic Act**

34.     The Federal Food, Drug, and Cosmetic Act (hereinafter, "FDCA"), 21 U.S.C. §§ 301 *et. seq.*, governs the sale of foods, drugs, and cosmetics in the United States. The classification of a product as a food, drug, or cosmetic affects the regulations by which the product must abide. In general, a product is characterized according to its intended use, which may be established, among other ways, by: (a) claims stated on the product's labeling, in advertising, on the Internet, or in other promotional materials; (b) consumer perception established through the product's reputation, for example by asking why the consumer is buying it and what the consumer expects it to do; or (c) the inclusion of ingredients well-known to have therapeutic use, for example fluoride in toothpaste.

35.     The FDCA defines drugs, in part, by their intended use, as "articles intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease," or "articles (other than food) intended to affect the structure or function of the body of man or other animals," 21 U.S.C. § 321(g)(1).

36.     The FDCA defines cosmetics by their intended use, as "articles intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to the human body . . . for cleansing, beautifying, promoting attractiveness, or altering appearance," 21 U.S.C. § 321(i)(1).

37.     The FDA has explained that "[s]ome products meet the definitions of both cosmetics and drugs," for example, "when a product has two intended uses" as with an anti-

dandruff shampoo," which "is a cosmetic because its intended use is to cleanse the hair," and also "is a drug because of its intended use is to treat dandruff . . . Such products must comply with the requirements for both cosmetics and drugs."

38.     Cosmetic and drug manufacturers must comply with federal and state laws and regulations governing labeling oral care products. Among these are the Federal Food, Drug and Cosmetic Act and its labeling regulations, including those set forth in 21 C.F.R. part 101.

39.     Under the FDCA, the term "false" has its usual meaning of "untruthful," while the term "misleading" is a term of art. Misbranding reaches not only false claims, but also those claims that might be technically true, although still misleading. If any one representation in the labeling is misleading, the entire food is misbranded. No other statement in the labeling cures a misleading statement. "Misleading" is judged in reference to "the ignorant, the unthinking and the credulous who, when making a purchase, do not stop to analyze." *United States v. El-O-Pathic Pharmacy*, 192 F.2d 62, 75 (9th Cir. 1951). Under the FDCA, it is not necessary to prove that anyone was actually misled.

40.     State laws have placed similar requirements as federal laws on drug and cosmetic companies that are designed to ensure that the claims companies are making about their products to consumers are truthful and accurate.

41.     Defendant's labeling and advertising of the Product violate various state laws against misbranding. New York State law broadly prohibits the misbranding of drug and cosmetic products in language identical to that found in regulations promulgated pursuant to the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq.:

> Pursuant to N.Y. State Education Law § 6815, "A drug shall be deemed misbranded…
> under circumstances including, but not limited to, any of the following: (1) If its labeling
> is false or misleading in any particular."

Pursuant to N.Y. State Education Law § 6818, "Any cosmetic shall be deemed misbranded… under circumstances including, but not limited to, any of the following: (1) If its labeling is false or misleading in any particular."

42.     Defendant's Product was misbranded under the laws of the fifty states and the District of Columbia because they misled Plaintiffs and Class members about the naturalness of the Product.

43.     Although Defendant marketed the Product as "Natural," they failed to also disclose material information about the Product; the fact that they contained an unnatural, synthetic, and/or artificial ingredient. This non-disclosure, while at the same time branding the Product as "Natural," was deceptive and likely to mislead a reasonable consumer.

44.     A representation that a product is "Natural" is material to a reasonable consumer when deciding to purchase a product. According to Consumers Union, "Eighty-six percent of consumers expect a 'natural' label to mean processed foods do not contain any artificial ingredients."[2]

45.      Plaintiffs did, and a reasonable consumer would, attach importance to whether Defendant's Product is "misbranded," i.e., not legally salable, or capable of legal possession, and/or contain highly processed ingredients.

46.     Plaintiffs did not know, and had no reason to know, that the Product is and was not "Natural."

47.     Defendant's Product labeling and packaging and misleading website were material factors in Plaintiffs' and Class members' decisions to purchase the Product. Relying on Defendant's Product labeling and misleading website, Plaintiffs and Class members believed that

---

[2] Notice of the Federal Trade Commission, Comments of Consumers Union on Proposed Guides for Use of Environmental Marketing Claims, 16 CFR § 260, Dec. 10,  2010, http://www.ftc.gov/sites/default/files/documents/public_comments/guides-use-environmental-marketing-claims-project-no.p954501-00289%C2%A0/00289-57072.pdf (last visited January 29, 2015).

they were getting Product that were "Natural." Had Plaintiffs known Defendant's Product was non-natural and highly processed, they would not have purchased it.

48.     Defendant's Product labeling as alleged herein is deceptive and misleading and was designed to increase sales of the Product. Defendant's misrepresentations are part of their systematic Product packaging practice.

49.     At the point of sale, Plaintiffs and Class members did not know, and had no reason to know, that the Product were misbranded as set forth herein, and would not have bought the Product had they known the truth about them.

50.     Defendant's false and deceptive labeling is misleading and in violation of FDA and consumer protection laws of each of the fifty states and the District of Columbia, and the Product at issue are misbranded as a matter of law. Misbranded products cannot be legally manufactured, advertised, distributed, held or sold in the United States. Plaintiffs and Class members would not have bought the Product had they known they were misbranded and illegal to sell or possess.

51.     As a result of Defendant's misrepresentations, Plaintiffs and thousands of others throughout the United States purchased the Product.

52.     Plaintiffs and the Class (defined below) have been damaged by Defendant's deceptive and unfair conduct in that they purchased the Product with false and deceptive labeling and paid premium prices they otherwise would not have paid over other comparable products that did not claim to be "Natural."

**Plaintiffs Were Injured as a Result of Defendant's Misleading and Deceptive Conduct**

53.     Defendant's labeling as alleged herein is false and misleading and was designed to increase sales of the Product at issue. Defendant's misrepresentations are part of their systematic Product labeling practice.

54.     Plaintiffs and Class members were exposed to Defendant's extensive marketing campaign, including misrepresentations made via social media as stated herein. At the time of purchase, Plaintiffs and Class members read the labels on Defendant's Product, including labels with the "Natural" misbranding.

55.     Defendant's labeling claims were a material factor in Plaintiffs and Class members' decisions to purchase the Product. Based on Defendant's claims, Plaintiffs and Class members believed that the Product was a better and healthier choice than other available children's toothpaste products.

56.     Plaintiffs and Class members did not know that the term "Natural" did not refer to the children's toothpaste Product being entirely natural. Plaintiffs and Class members would not have bought the purchased Product had they known that the term "Natural" referred to only certain ingredients that were minimally processed.

57.     Plaintiffs and Class members were exposed to these misrepresentations prior to purchase and relied on them. As a result of such reliance, Plaintiffs and Class members thought that the Product was preferable to children's toothpaste products lacking such false and misleading statements. Plaintiffs and Class members would not have bought the purchased products had they not been misled by the "Natural" representation into believing that the Product was better and healthier than it actually is.

58.     At the point of sale, Plaintiffs and Class members did not know, and had not reason to know, that Defendant's Product were misbranded as set forth herein, and would not have bought the Product had they known the truth about it.

59.     Reasonable consumers would be, and were, misled in the same manner as Plaintiffs in that a reasonable consumer would believe "Natural" referred to "All Natural" in the context of the Product.

60.     As a result of Defendant's misrepresentations, Plaintiffs and thousands of others throughout the United States purchased the Product.

61.     Defendant's labeling, advertising, and marketing as alleged herein is false and misleading and designed to increase sales of the Product. Defendant's misrepresentations are a part of an extensive labeling, advertising and marketing campaign, and a reasonable person would attach important to Defendant's representations in determining whether to purchase the Product at issue. Plaintiffs and Class members would not have purchased Defendant's misbranded Product had they known it was misbranded.

62.     Plaintiffs and the Class (defined below) have been damaged by Defendant's deceptive and unfair conduct in that they purchased the Product with false and deceptive labeling and paid premium prices they otherwise would not have paid over other comparable products that did not claim to be "Natural."

## CLASS ACTION ALLEGATIONS

*The Nationwide Class*

63.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following class (the "Class"):

> All persons or entities in the United States who made retail
> purchases of the Product during the applicable limitations period,
> and/or such subclasses as the Court may deem appropriate.

***The New York Class***

64.     Plaintiff TRONCOSO seeks to represent a class consisting of the following

subclass (the "New York Class"):

> All New York residents who made retail purchases of the Product
> during the applicable limitations period, and/or such subclasses as
> the Court may deem appropriate.

65.     The proposed Classes exclude current and former officers and directors of

Defendant, members of the immediate families of the officers and directors of Defendant,

Defendant's legal representatives, heirs, successors, assigns, and any entity in which they have or

have had a controlling interest, and the judicial officer to whom this lawsuit is assigned.

66.     Plaintiffs reserve the right to revise the Class definition based on facts learned in

the course of litigating this matter.

67.     This action is proper for class treatment under Rules 23(b)(1)(B) and 23(b)(3) of

the Federal Rules of Civil Procedure. While the exact number and identities of other Class

members are unknown to Plaintiffs at this time, Plaintiffs are informed and believe that there are

thousands of Class members. Thus, the Class is so numerous that individual joinder of all Class

members is impracticable.

68.     Questions of law and fact arise from Defendant's conduct described herein. Such

questions are common to all Class members and predominate over any questions affecting only

individual Class members and include:

> a.   whether labeling "Natural" on Product containing Glycerin, was false and
>        misleading;

b.  whether Defendant engaged in a marketing practice intended to deceive consumers by labeling "Natural" on Product containing Glycerin;

c.  whether Defendant deprived Plaintiffs and the Class of the benefit of the bargain because the Product purchased were different than what Defendant warranted;

d.  whether Defendant deprived Plaintiffs and the Class of the benefit of the bargain because the Product they purchased had less value than what was represented by Defendant;

e.  whether Defendant caused Plaintiffs and the Class to purchase a substance that was other than what was represented by Defendant;

f.  whether Defendant caused Plaintiffs and the Class to purchase Products that were artificial, synthetic, or otherwise unnatural;

g.  whether Defendant have been unjustly enriched at the expense of Plaintiffs and other Class members by their misconduct;

h.  whether Defendant must disgorge any and all profits they have made as a result of their misconduct; and

i.  whether Defendant should be barred from marketing the Product as "Natural."

69.     Plaintiffs' claims are typical of those of the Class members because Plaintiffs and the other Class members sustained damages arising out of the same wrongful conduct, as detailed herein. Plaintiffs purchased Defendant's Product and sustained similar injuries arising out of Defendant's conduct in violation of New York State law. Defendant's unlawful, unfair and fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced. The injuries of the Class were caused directly by Defendant's wrongful misconduct. In addition, the factual underpinning of Defendant's misconduct is

common to all Class members and represents a common thread of misconduct resulting in injury to all members of the Class. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the members of the Class and are based on the same legal theories.

70.     Plaintiffs will fairly and adequately represent and pursue the interests of the Class and have retained competent counsel experienced in prosecuting nationwide class actions. Plaintiffs understand the nature of their claims herein, have no disqualifying conditions, and will vigorously represent the interests of the Class. Neither Plaintiffs nor Plaintiffs' counsel have any interests that conflict with or are antagonistic to the interests of the Class. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the Class. Plaintiffs and Plaintiffs' counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class and will diligently discharge those duties by vigorously seeking the maximum possible recovery for the Class.

71.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The damages suffered by any individual class member are too small to make it economically feasible for an individual class member to prosecute a separate action, and it is desirable for judicial efficiency to concentrate the litigation of the claims in this forum. Furthermore, the adjudication of this controversy through a class action will avoid the potentially inconsistent and conflicting adjudications of the claims asserted herein. There will be no difficulty in the management of this action as a class action.

72.     The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(2) are met, as Defendant has acted or refused to act on grounds

generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

73.     The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(3) are met, as questions of law or fact common to the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

74.     The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant. Additionally, individual actions may be dispositive of the interest of all members of the Class, although certain Class members are not parties to such actions.

75.     Defendant's conduct is generally applicable to the Class as a whole and Plaintiffs seek, *inter alia*, equitable remedies with respect to the Class as a whole. As such, Defendant's systematic policies and practices make declaratory relief with respect to the Class as a whole appropriate.

## CAUSES OF ACTION

### COUNT I

**INJUNCTION FOR VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349 (DECEPTIVE AND UNFAIR TRADE PRACTICES ACT)**

76.     Plaintiff TRONCOSO repeats and realleges each and every allegation contained above as if fully set forth herein and further alleges the following:

77.     Plaintiff TRONCOSO brings this claim individually and on behalf of the other members of the Class for an injunction for violations of New York's Deceptive Acts or Practices Law, General Business Law § 349 ("NY GBL").

78.     NY GBL § 349 provides that "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are . . . unlawful."

79.     Under the § 349, it is not necessary to prove justifiable reliance.  ("To the extent that the Appellate Division order imposed a reliance requirement on General Business Law [§] 349 … claims, it was error.  Justifiable reliance by the plaintiff is not an element of the statutory claim."  *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941 (N.Y. App. Div. 2012) (internal citations omitted)).

80.     Any person who has been injured by reason of any violation of the NY GBL may bring an action in their own name to enjoin such unlawful act or practice, an action to recover their actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the Defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

81.     The practices employed by Defendant, whereby Defendant advertised, promoted, and marketed that their Product contain "Natural" ingredients, were unfair, deceptive, and misleading and are in violation of the NY GBL § 349.

82.     The foregoing deceptive acts and practices were directed at customers.

83.     Defendant should be enjoined from marketing their Product as "Natural" as described above pursuant to NY GBL § 349.

84.     Plaintiff TRONCOSO, on behalf of himself and all others similarly situated, respectfully demands a judgment enjoining Defendant's conduct, awarding costs of this proceeding and attorneys' fees, as provided by NY GBL, and such other relief as this Court deems just and proper.

## COUNT II

### VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349
### (DECEPTIVE AND UNFAIR TRADE PRACTICES ACT)

85.     Plaintiff TRONCOSO repeats and realleges each and every allegation contained above as if fully set forth herein and further alleges the following:

86.     Plaintiff TRONCOSO brings this claim individually and on behalf of the other members of the Class for violations of NY GBL § 349.

87.     By the acts and conduct alleged herein, Defendant committed unfair or deceptive acts and practices by misbranding their Product as "Natural."

88.     The practices employed by Defendant, whereby Defendant advertised, promoted, and marketed that their Product are "Natural" were unfair, deceptive, and misleading and are in violation of NY GBL § 349.

89.     The foregoing deceptive acts and practices were directed at consumers.

90.     Plaintiff TRONCOSO and the other Class members suffered a loss as a result of Defendant's deceptive and unfair trade acts. Specifically, as a result of Defendant's deceptive and unfair trade acts and practices, Plaintiff and the other Class members suffered monetary losses associated with the purchase of the Product, *i.e.*, the purchase price of the Product and/or the premium paid by Plaintiff and the Class for said Product.

### COUNT III

### NEGLIGENT MISREPRESENTATION
### (All States)

91.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein and further allege the following:

92.     Defendant, directly or through their agents and employees, made false representations, concealments, and nondisclosures to Plaintiffs and members of the Class.

93.     In making the false, misleading, and deceptive representations and omissions, Defendant knew and intended that consumers would pay a premium for "Natural" labeled products over comparable products that are not labeled "Natural" furthering Defendant's private interest of increasing sales for their Product and decreasing the sales of products that are truthfully offered as "Natural" by Defendant's competitors, or those that do not claim to be "Natural".

94.     As an immediate, direct, and proximate result of Defendant's false, misleading, and deceptive representations and omissions, Defendant injured Plaintiffs and the other Class members in that they paid a premium price for Product that were not as represented.

95.     In making the representations of fact to Plaintiffs and members of the Class described herein, Defendant has failed to fulfill their duties to disclose the material facts set forth above. The direct and proximate cause of this failure to disclose was Defendant's negligence and carelessness.

96.     Defendant, in making the misrepresentations and omissions, and in doing the acts alleged above, knew or reasonably should have known that the representations were not true. Defendant made and intended the misrepresentations to induce the reliance of Plaintiffs and members of the Class.

97.     Plaintiffs and members of the Class relied upon these false representations and nondisclosures by Defendant when purchasing the Product, upon which reliance was justified and reasonably foreseeable.

98.     As a result of Defendant's wrongful conduct, Plaintiffs and members of the Class have suffered and continue to suffer economic losses and other general and specific damages, including but not limited to the amounts paid for the Product and any interest that would have been accrued on those monies, all in an amount to be determined according to proof at time of trial.

## COUNT IV

## BREACH OF EXPRESS WARRANTIES
### (All States)

99.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein and further allege the following:

100.    Defendant provided Plaintiffs and other members of the Class with written express warranties, including, but not limited to, warranties that their Product has "Natural" ingredients.

101.    This breach resulted in damages to Plaintiffs and the other members of the Class who bought Defendant's Product but did not receive the goods as warranted in that the Product was not as healthy nor as pure as it appears to be.

102.    As a proximate result of Defendant's breach of warranties, Plaintiffs and the other Class members have suffered damages in an amount to be determined by the Court and/or jury, in that, among other things, they purchased and paid for a Product that did not conform to what Defendant promised in their promotion, marketing, advertising, packaging and labeling, and they were deprived of the benefit of their bargain and spent money on products that did not have any value or had less value than warranted or products that they would not have purchased and used had they known the true facts about them.

**COUNT V**

**UNJUST ENRICHMENT**
**(All States)**

103.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein and further allege the following:

104.    As a result of Defendant's deceptive, fraudulent and misleading labeling, packaging, advertising, marketing and sales of the Product, Defendant were enriched, at the expense of Plaintiffs and members of the Class, through the payment of the purchase price for Defendant's Product.

105.    Plaintiffs and members of the Class conferred a benefit on Defendant through purchasing the Product, and Defendant has knowledge of this benefit and have voluntarily accepted and retained the benefits conferred on it.

106.    Defendant will be unjustly enriched if they are allowed to retain such funds, and each Class member is entitled to an amount equal to the amount they enriched Defendant and for which Defendant has been unjustly enriched.

107.    Under the circumstances, it would be against equity and good conscience to permit Defendant to retain the ill-gotten benefits that they received from Plaintiffs, and all others similarly situated, in light of the fact Defendant has represented that the Product are "Natural," when in fact, the Product contain the above alleged unnatural ingredients.

108.    Defendant profited from their unlawful, unfair, misleading, and deceptive practices and advertising at the expense of Plaintiffs and Class members, under circumstances in which it would be unjust for Defendant to be permitted to retain said benefit.

109.    Plaintiffs have standing to pursue this claim as Plaintiffs have suffered injury in fact and has lost money or property as a result of Defendant's actions, as set forth herein.

28

Defendant is aware that the claims and/or omissions that they made about the Product are false, misleading, and likely to deceive reasonable consumers, such as Plaintiffs and members of the Class.

110.    Plaintiffs and Class members do not have an adequate remedy at law against Defendant (in the alternative to the other causes of action alleged herein).

111.    Accordingly, the Product is valueless such that Plaintiffs and Class members are entitled to restitution in an amount not less than the purchase price of the Product paid by Plaintiffs and Class members during the Class Period.

112.    Plaintiffs and Class members are entitled to restitution of the excess amount paid for the Product, over and above what they would have paid if the Product had been adequately advertised, and Plaintiffs and Class members are entitled to disgorgement of the profits Defendant derived from the sale of the Product.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, seek judgment against Defendant, as follows:

A.    For an order certifying the nationwide Class and under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Plaintiffs' attorneys as Class Counsel to represent members of the Class;

B.    For an order declaring the Defendant's conduct violates the statutes referenced herein;

C.    For an order finding in favor of Plaintiffs and the nationwide Class;

D.    For compensatory and punitive damages in amounts to be determined by the Court and/or jury;

E.     For prejudgment interest on all amounts awarded;

F.     For an order of restitution and all other forms of equitable monetary relief;

G.     For injunctive relief as pleaded or as the Court may deem proper;

H.     For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and

       expenses and costs of suit; and

I.     Any other relief the Court may deem appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand a jury

trial on all claims so triable.


Dated:  December 4, 2015

                              Respectfully submitted,

                              **LEE LITIGATION GROUP, PLLC**
                              C.K. Lee (CL 4086)
                              Anne Seelig (AS 3976)
                              30 East 39th Street, Second Floor
                              New York, NY 10016
                              Tel.: 212-465-1188
                              Fax: 212-465-1181
                              *Attorneys for Plaintiffs and the Class*


                              By:    /s/ C.K. Lee
                                        C.K. Lee, Esq.